David KNICKERBOCKER,
Plaintiff–Appellant,

v.

CITY OF STOCKTON, a California Municipal Corporation, George Lerner, Ralph Womack and Kenneth Wilbon, Defendants–Appellees.

No. 95–15011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 14, 1996.

Decided April 22, 1996.

---

Curtis Leavitt and Richard J. Chiurazzi, Mastagni, Holstedt & Chiurazzi, Sacramento, California, for plaintiff-appellant.

Lauren P. Thomasson, Deputy City Attorney, Stockton, California, for defendants-appellees.

Before: THOMPSON and KLEINFELD, Circuit Judges, and WILSON, District Judge.*

## OPINION

WILSON, District Judge:

### OVERVIEW

Appellant David Knickerbocker ("Knickerbocker") is a sergeant with the City of Stockton Police Department ("C.S.P.D."). Knickerbocker appeals from the District Court's

---

* Honorable Stephen V. Wilson, United States District Judge for the Central District of California, sitting by designation.

entry of judgment for Defendant–Appellees on Knickerbocker's retaliation claim under the FLSA.

## JURISDICTION

The District Court had jurisdiction over the case under 28 U.S.C. § 1331. The final judgment of the District Court was entered on December 1, 1994. This Court has jurisdiction over the appeal from the final judgment pursuant to 28 U.S.C. § 1291.

## FACTUAL BACKGROUND

Knickerbocker is a sworn police sergeant employed by the C.S.P.D. Knickerbocker is also a Board Member of the Stockton Police Officers Association ("S.P.O.A."). Appellees are the City of Stockton ("the City"), Deputy Chief of Police Kenneth Wilbon, Captain Ralph Womack, and Lieutenant George Lerner. During the period in question, Captain Womack was temporarily assigned to the rank of Acting Deputy Chief of Police; Lieutenant Lerner was the Acting Captain of Police during the same period.

In April, 1991, four officers of the Los Angeles Police Department were acquitted in state court of charges arising out of the beating of Rodney King. As a result of the acquittal, civil disturbances broke out in Los Angeles and other cities across the United States. Federal charges were subsequently brought against the officers. The verdicts in the federal case were expected to be announced around April 16, 1993.

In anticipation of civil unrest that might have followed the announcement of the federal verdicts, the C.S.P.D. developed a "contingency plan" aimed at ensuring that adequate personnel would be available to respond to any disturbances. One aspect of this plan was to place patrol officers on "stand-by" when their shifts ended. Initially, "stand-by" required the officers to remain by their phones in their homes to allow them to report to the police station within one half-hour of receiving a call from the station.

Womack and Lerner communicated the stand-by plan to patrol officers at the beginning of each shift, beginning with the 9:00 p.m. shift on the night of Tuesday, April 13, 1993. On Wednesday, April 14, Knickerbocker told Lerner that he felt the stand-by plan violated the S.P.O.A.'s Memorandum of Understanding ("M.O.U.") and was otherwise unlawful. Knickerbocker agreed to adhere to the plan, but indicated he would fight it with management.

On Thursday, April 15, 1993, Lerner attempted to call the senior sergeants from all four shifts, including Knickerbocker, in order to arrange a meeting to revise the stand-by plan. Knickerbocker was supposed to be on stand-by at the time Lerner called. Although Lerner reached the three other senior sergeants, he did not reach Knickerbocker or anyone else at Knickerbocker's number. Lerner testified that he tried to call Knickerbocker three times that day, but only reached an answering machine each time. Lerner testified that each time he called, he left Knickerbocker a message to call him at the station. Knickerbocker testified that although he received Lerner's messages, he did not try to contact Lerner personally until Friday morning.

When Knickerbocker spoke with Lerner on Friday morning, Lerner explained that he was engaged in a meeting with the other senior sergeants to revise the stand-by plan. Lerner testified that he asked Knickerbocker if he would come in to participate in the meeting, but that Knickerbocker said he would not come in. Lerner and the other three sergeants continued their meeting and developed a revised plan which designated the senior sergeants as "contact persons" for the officers on their shifts, allowing the officers to call in to the sergeants rather than wait at home on stand-by. Because Knickerbocker was not at the meeting, another sergeant took on double duty by agreeing to act as the contact person for Knickerbocker's officers as well as his own.

After the meeting, Lerner informed Captain Womack of the conversation he had had with Knickerbocker. Womack instructed Lerner to call Knickerbocker and order him to report to work. When Knickerbocker arrived, he, Womack, and Lerner met to discuss Womack and Lerner's perception that Knickerbocker had failed to rise to the occa-

sion and fulfill his supervisorial duties during a potentially volatile situation. The meeting was heated and Knickerbocker reiterated his position that the stand-by plan, even as modified, was unlawful.

On Saturday and Sunday, Knickerbocker received inquiries from many officers on his shift regarding how their time-cards should reflect hours spent at home under the initial stand-by policy. Knickerbocker informed them by telephone and by the computer system that they should claim 24 hours overtime during the time they were on stand-by. Some officers completed their time-cards as suggested and submitted them to the C.S.P.D. on Saturday and Sunday.

On Monday morning, Lerner spoke with Womack and recommended transferring Knickerbocker. That same day, Womack and Lerner spoke with Wilbon about the transfer. At least four factors were mentioned regarding the transfer—Knickerbocker's failure to adhere to the stand-by procedures, failure to rise to the occasion in general, participation in S.P.O.A. activities that hurt Womack's "operation," and questioning the stand-by policy's legitimacy under the FLSA. Wilbon approved the transfer. There is no dispute that the relevant administrators were told to disguise the transfer as "routine" even though it was not. On Wednesday, April 21, Knickerbocker was told that he was being transferred to an assignment in the Adult Investigations unit.

## DISTRICT COURT DECISION

Appellant was one of forty-eight plaintiffs claiming that the Stockton Police Department's stand-by policy violated FLSA overtime provisions. Appellant also claimed that the C.S.P.D. violated the FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), by transferring him to Adult Investigations. After a two day court trial, the District Court issued a written order in which it found for the plaintiffs on the basic overtime claim, but

found against Knickerbocker on his retaliation claim.

The District Court first stated that informal complaints to supervisors such as those made by Knickerbocker to Lerner were not protected activities under the FLSA. Order at 19. The District Court did not base its ruling on that conclusion, however, since the City had not raised the issue in its defense. The District Court instead concluded that Knickerbocker had set forth a prima facie case of retaliation, but that the C.S.P.D. had set forth legitimate, non-retaliatory reasons for Knickerbocker's transfer, namely Knickerbocker's failure to adhere to the stand-by procedures, failure to participate in devising a new plan, as well as his participation in S.P.O.A. activities which interfered with department operations.[1] The court then concluded that Knickerbocker's complaints about the stand-by procedures and his advice to officers regarding the time-cards were "insignificant reasons for the transfer." *Id.* at 20. Therefore, the court held that Knickerbocker had failed to satisfy his burden to show that the reasons set forth by the C.S.P.D. were a mere pretext for retaliation. *Id.*

## DISCUSSION

### *Standard of Review*

■ Knickerbocker appeals from the District Court's finding that Knickerbocker's FLSA activities played an insignificant role in the C.S.P.D.'s decision to transfer him to Adult Investigations. Appellant proceeds under the mistaken belief that, whenever the underlying historical facts in a case are not in dispute, the District Court's findings are necessarily legal and not factual in nature. App. Brief at 2.

A conclusion about whether or not Knickerbocker would have been transferred but for his protected activities is a factual one reviewed for clear error even when the underlying historical facts are not in dispute. F.R.C.P. 52; *Pullman–Standard v. Swint,*

---

[1]. Although the District Court found that Knickerbocker's S.P.O.A. activities were a motivating factor in the decision to transfer Knickerbocker, Knickerbocker did not argue at trial and does not argue on appeal that adverse employment decisions motivated by such activities can form the basis for recovery under the FLSA. Order at 20, n. 9.

456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982) (rejecting distinction for Rule 52 purposes between ultimate and subsidiary facts); *see also Jordan v. Clark*, 847 F.2d 1368, 1377 (9th Cir.1988) (reviewing finding that adverse actions were not prompted by protected activity under Title VII for clear error), *cert. denied, sub nom Jordan v. Hodel*, 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989); *San Filippo v. Bongiovanni*, 30 F.3d 424, 443–46 (3rd Cir. 1994) (treating issue of whether protected activities were a substantial motivating factor in discharge as a question of fact), *cert. denied*, —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). Therefore, this court must uphold the District Court's finding unless, after reviewing the entire evidence, we are "left with definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products v. Const. Laborers Pension Trust*, 508 U.S. 602, 622, 113 S.Ct. 2264, 2280, 124 L.Ed.2d 539 (1993); *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Beech Aircraft Corp. v. U.S.*, 51 F.3d 834 (9th Cir.1995); *Breneman v. Kennecott Corporation*, 799 F.2d 470, 474 (9th Cir.1986).

*Merits*

The parties do not dispute the District Court's conclusion that Knickerbocker's transfer was motivated both by his advice to his officers on the overtime issue and his perceived inability to function cooperatively within the department. Where, as here, an adverse employment action was based on protected and unprotected activities, courts apply the "dual motive" test announced in *Mt. Healthy City School District Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50

L.Ed.2d 471 (1977) to determine whether the plaintiff has met her ultimate burden of proving improper retaliation. *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 877–78 (2d Cir.1988); *see also Ruggles v. California Polytechnic State University*, 797 F.2d 782 (9th Cir.1986)(applying *Mt. Healthy* analysis to Title VII retaliation claim).[2] Under the dual motive test, a plaintiff must show that her protected activities were a "substantial factor" in the complained of adverse employment action. Protected activities are a "substantial factor" where the adverse actions would not have been taken "but for" the protected activities. *Brock*, 839 F.2d at 877. In dual motive cases, it is the defendant's affirmative burden to prove that it would have taken the adverse action if the proper reason alone had existed. *Id.*

After reviewing all of the evidence in the case, we are not "left with a definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products*, 508 U.S. at 622, 113 S.Ct. at 2280. Knickerbocker focuses on the fact that the evidence in the case compels the conclusion that the decision to transfer Knickerbocker was not made until Monday, April 19, 1993. He points out that all of the reasons for his transfer accepted by the District Court as true had accrued by Friday, April 16 except for his advice to his fellow officers regarding time-cards. The C.S.P.D. only became aware of the time-card issue over the weekend. Thus, Knickerbocker argues, since the transfer decision was not made until Monday and there is no evidence that the decision was even discussed before Monday, the evidence compels the conclusion that the decision to transfer him would not have been made had he not advised his offi-

---

**2.** Knickerbocker argues that adverse employment actions should be deemed retaliatory if the protected conduct was "in any way" a part of the employer's decision. However, we conclude that the *Mt. Healthy* approach is the wiser one in cases where a decision was actually founded on both protected and unprotected conduct. In addition, the cases cited by Knickerbocker do not clearly stand for the rule he proposes. Although the cases state that a discharge is discriminatory if motivated "in any part" by protected conduct, a closer reading reveals that the cases either favor a "but for" test of causation or were not addressing dual motive situations. *See Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 180 (8th

Cir.1975) (reversing finding of no retaliation where employee scheduled for future discharge would not have been fired when he was but for his protected conduct) citing *Mitchell v. Goodyear Tire & Rubber Co.*, 278 F.2d 562 (8th Cir. 1960); *Goldberg v. Bama Mfg. Corp.*, 302 F.2d 152 (5th Cir.1962) (record revealed that, despite the fact that employee could have been terminated for "half a dozen" other reasons, she was in fact only fired for asserting FLSA rights); *see also Hageman v. Park West Gardens*, 480 N.W.2d 223, 231, 30 Wage & Hour Cas. (BNA) 1198, 120 Lab.Cas. p. 35,589 (N.D.1992) citing *Mitchell* and *Goodyear*.

cers to fill out their time cards to reflect 24 hours of work during the stand-by.

The District Court's finding was not clearly erroneous. Although Knickerbocker does not present an unpersuasive interpretation of the facts, it is not the only reasonable one. Knickerbocker suggests that, if the decision to transfer were really based on his uncooperative behavior, it should have been made by Friday and communicated to Knickerbocker at the Friday meeting. However, one cannot discount the fact that the C.S.P.D. was trying to ready itself to respond to possible civil disturbances on Friday and that Saturday and Sunday are not normal business days. Therefore, it is reasonable to conclude that Monday was the first time that Knickerbocker's superiors had a chance to reflect on how to respond to his lack of cooperation during the stand-by. Although adverse action following close on the heels of protected activity can support an inference of retaliation, *Burrus v. United Telephone Company of Kansas*, 683 F.2d 339, 343 (10th Cir.1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982), such an inference is not compelled where other evidence provides a reasonable basis for inferring that adverse action was not retaliatory. In addition, regardless of the timing of the decision, the evidence supports a conclusion that Knickerbocker's superiors were primarily frustrated with his lack of cooperation in the stand-by and his seemingly willful disobedience of orders and willingness to create dissent among the rank and file officers during a time when a "team" mentality was sorely needed. Therefore, the District Court's conclusion that Knickerbocker's oral complaints and advice on the time-card issue were insignificant reasons for the transfer is not clearly erroneous.

**3.** Because we affirm the District Court's finding of no retaliation, we do not need to decide whether or not Knickerbocker's informal complaints and advice to fellow officers were protected conduct under the FLSA. *See Lambert v. Genesee Hosp.*, 10 F.3d 46 (2d Cir.1993) (informal complaints to supervisors are not protected conduct), *cert. denied*, — U.S. —, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *contra EEOC v. Romeo Community Sch.*, 976 F.2d 985, 990 (6th Cir.1992); *Brennan v. Maxey's Yamaha, Inc.*, 513

The District Court's judgment in favor of the City on the retaliation claim is AFFIRMED.[3]

F.2d 179 (8th Cir.1975); *Love v. RE/MAX of Am. Inc.*, 738 F.2d, 383, 387 (10th Cir.1984); *EEOC v. White & Son Enters*, 881 F.2d 1006, 1011 (11th Cir.1989); *see also Brock v. Richardson*, 812 F.2d 121, 124 (3rd Cir.1987) (noting that courts have applied § 215 to activities not explicitly covered by language of the statute); *Crowley v. Pace Suburban Bus. Div.*, 938 F.2d 797, 798 n. 3 (7th Cir.1991) (noting that § 215 has been construed broadly).